# United States Court of Appeals for the Federal Circuit

---

**TINTON FALLS LODGING REALTY, LLC,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
**DMC MANAGEMENT SERVICES, LLC,**
*Defendants-Appellees*

---

2014-5140

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00353-EGB, Senior Judge Eric G. Bruggink.

---

Decided: September 2, 2015

---

LEE DOUGHERTY, Offit Kurman, Attorneys at Law, Vienna, VA, argued for plaintiff-appellant. Also represented by KATHERINE AMANDA STRAW.

NATHANAEL YALE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by JOYCE R. BRANDA, ROBERT E. KIRSCHMAN, JR., DEBORAH A. BYNUM; DAVIS YOUNG, JEFFREY DAVENPORT, Military Sealift Command, United States Navy, Norfolk, VA.

JONATHAN TODD WILLIAMS, Piliero Mazza PLLC, Washington, DC, argued for defendant-appellee DMC Management Services, LLC. Also represented by KATHRYN V. FLOOD.

––––––––––––––––––

Before DYK, REYNA, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* CHEN.

Dissenting opinion filed by *Circuit Judge* REYNA.

CHEN, *Circuit Judge.*

Tinton Falls Lodging Realty, LLC (Tinton Falls) appeals from a final judgment of the United States Court of Federal Claims (Claims Court) entered in favor of appellees the government and DMC Management Services, LLC (DMC) after granting motions on the administrative record that DMC was eligible for an award of a small business set-aside contract. *See* Joint Appendix (J.A.) 3774–75. Tinton Falls claims this was error. We affirm.

## BACKGROUND

On February 19, 2013, the United States Department of the Navy, Military Sealift Command, in Norfolk, Virginia (MSC), issued contract Solicitation Number N32205-13-R-6005 (the solicitation). The solicitation involved the management and coordination of lodging and transportation services for federal civil service mariners (CIVMARs) who were completing required training at the MSC Training Center in Freehold, New Jersey. J.A. 172, 178–79. MSC issued the solicitation as a total small business set-aside under North American Industrial Classification System (NAICS) code 721110 ("Hotels (except Casino Hotels)"). J.A. 172.

The scope of work for the solicitation required the winning contractor 1) to provide a sufficient number of

rooms at lodging facilities (*i.e.* hotels) in the vicinity of the MSC Training Center for CIVMARs attending training throughout the life of the contract, and 2) to provide transportation to and from those hotels to the MSC Training Center. J.A. 248–51. The contractor was required to specify a primary hotel and two or more overflow, or backup, hotels. J.A. 248. More than half of the CIVMARs attending training had to be housed at the primary hotel at all times. *Id.* The solicitation noted that based on historical data, MSC would require around 65 hotel rooms each night. *Id.* This number of rooms, however, often varied between 25 and 120, and the contractor was expected to ensure a sufficient number of rooms were available to house CIVMARs for the duration of the contract, regardless of how many hotel rooms MSC might require each night. *Id.* The solicitation made clear that MSC would be responsible only for the actual number of hotel rooms needed each night to house CIVMARs attending training. *Id.*

For transportation services, the solicitation required the contractor to provide each CIVMAR with daily transportation to and from the MSC Training Center whenever classes were scheduled, including weekends and holidays. J.A. 251. The contractor was required to "coordinate daily" with the MSC point of contact to determine how many trips between the primary and overflow hotels and the training center were needed to accommodate each CIVMAR's training schedule and to ensure "timely logistical arrangements" for those trips. J.A. 250. As with the hotel rooms, the solicitation made clear that MSC would be responsible only for the actual number of trips needed to transport CIVMARs to and from the training center. J.A. 251.

The scope of work also required the contractor to perform various other services, such as forwarding copies of any police reports based on illegal acts by, and maintaining plans to provide emergency medical treatment and/or

transportation to a hospital for, CIVMARs housed at the primary and overflow hotels. J.A. 249. The contractor was also required to verify the identity of each CIVMAR who checked into a primary or overflow hotel, maintain a daily sign-in record, and transmit this sign-in record to the MSC point of contact. J.A. 251.

Pursuant to Federal Acquisition Regulation (FAR) clause 52.212-2, MSC evaluated bidders based on their ability to satisfy the technical requirements of the solicitation, past performance on comparable government contracts (if any), and price. For the solicitation's technical requirements, bidders were evaluated based on four sub-factors: 1) general requirements of the primary and overflow hotels, 2) fire and safety policies and procedures of the primary and overflow hotels, 3) health and sanitation of the primary and overflow hotels, and 4) transportation to and from the primary and overflow hotels to the MSC Training Center. J.A. 222–24. For past performance, bidders had to provide evidence of performance within the past three years of a government contract with similar scope, magnitude, and complexity to the requirements of the solicitation. J.A. 255. For price, MSC indicated that it would evaluate bid proposals in accordance with FAR 15.404-1(b). J.A. 256.

MSC received bid proposals from multiple contractors. For reasons unclear from the record on appeal, MSC found all of the submitted proposals technically unacceptable, thus precluding award of the contract to any of the interested bidders. Appellee United States Br. at 9. MSC's contract review board then recommended that MSC establish a "competitive range" of bidders and hold discussions with those bidders in order to give them an opportunity to address MSC's technical concerns and revise pricing to remain competitive, in accordance with FAR 15.306(c)–(d). *Id.* The competitive range consisted of all the initial bidders, each of which revised and resubmitted its initial proposal. MSC accepted the bid

proposal of Mali, Inc. (Mali), whose revised bid was the lowest-priced, technically acceptable, and otherwise eligible proposal.

Losing bidder DMC filed a size protest with the Area Office of the Small Business Administration (SBA). In evaluating the protest, the SBA Area Office found that Mali was not a small business. In particular, the Area Office determined that Mali, along with Tinton Falls and two other companies that had submitted bid proposals, were part of the same family of hotels operated under a parent entity called Hotels Unlimited, Inc. (Hotels Unlimited). J.A. 2745–53. After reviewing Mali's articles of incorporation, by-laws, financial statements, and income tax returns, the Area Office concluded that Mali was "affiliated" with Hotels Unlimited for purposes of the solicitation, and that the combined entity—which had annual receipts of above $30 million—did not qualify as a "small business concern" under the applicable NAICS code. J.A. 2752–53, 2770. Mali appealed this determination to the SBA's Office of Hearing and Appeals (SBA-OHA), which affirmed the Area Office's conclusion. J.A. 2779–83. Because DMC had submitted the next lowest-priced, technically acceptable bid proposal, it was then declared as the successful bidder. J.A. 2654.

Tinton Falls then filed a size protest with the MSC contracting officer. Tinton Falls explained that DMC intended to subcontract the lodging services portion of the contract—which accounted for more than 80% of the value of the contract—to hotels that did not qualify as small businesses. J.A. 3457, 3459. As a result, Tinton Falls alleged that DMC was unusually reliant upon its subcontractors and would not itself be performing the "primary and vital requirements of the contract"—*i.e.,* the provision of lodging services—and thus had a relationship with the subcontracted hotels that violated the "ostensible subcontractor rule," 13 C.F.R. § 121.103(h)(4). J.A. 2830–37. The Area Office disagreed, concluding that 1) DMC would

perform the majority of the primary and vital require-
ments of the contract—the management and coordination
of lodging and transportation services to MSC—and 2)
DMC was not unusually reliant on any of its subcontrac-
tors. J.A. 3459–64. Therefore, because DMC qualified as
a small business under the applicable NAICS code and
had no affiliates or ostensible subcontractors, it was an
eligible small business for purposes of the solicitation.
J.A. 3465.

Tinton Falls appealed to the SBA-OHA, arguing that
the Area Office committed clear error in its decision.
While Tinton Falls' appeal was pending at the SBA-OHA,
the MSC contracting officer filed his own size protest of
Tinton Falls and two other bidders with the Area Office,
urging that these three entities (like Mali, the subject of
the earlier determination) also did not qualify as small
businesses. The protest asserted that the contracting
officer believed the remaining acceptable bidders (other
than DMC) were not small businesses under the applica-
ble NAICS code due to their affiliation with Mali and
Hotels Unlimited. J.A. 2786. The Area Office agreed,
issuing a size determination that due to their affiliation
with Mali, none of the remaining Hotel Unlimited entities
qualified as a small business for purposes of the solicita-
tion. J.A. 2815.

The SBA-OHA then rejected Tinton Falls' appeal and
upheld the Area Office decision that the primary and vital
requirements of the solicitation were a coordinated pack-
age of rooms, transportation, and other services. J.A.
3560. The SBA-OHA determined that DMC would be
performing a significant portion of the contract's primary
and vital requirements: coordinating hotel rooms and
transportation services to meet MSC's needs. J.A. 3560–
61. Thus, the SBA-OHA determined that DMC's relation-
ship with its subcontracted hotels did not violate the
ostensible contractor rule and that DMC could be consid-
ered a small business concern for purposes of the solicita-

tion. *Id.* Tinton Falls then appealed to the Claims Court by timely filing the bid protest at issue here and seeking preliminary and injunctive relief.[1] DMC intervened.

Tinton Falls' arguments before the Claims Court focused on one issue: whether the SBA-OHA had a rational basis for determining that the primary and vital requirements of the contract were a coordinated package of lodging and transportation services. The parties filed cross-motions for judgment on the administrative record. After oral argument, the Claims Court granted the government's and DMC's motions and denied the relief requested by Tinton Falls. Specifically, the Claims Court determined that the SBA-OHA had a rational basis for its conclusion that the primary purpose of the solicitation was a coordinated package of rooms, transportation, and services to meet MSC's fluctuating needs. J.A. 3774. The Claims Court entered final judgment for the government and DMC, and Tinton Falls timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The Claims Court's legal determinations, including interpretations of statutes and regulations, are subject to de novo review and its factual determinations are reviewed for clear error. *CMS Contract Mgmt. Serv. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1385 (Fed. Cir. 2014). Accordingly, we review the grant of a motion for judgment on the administrative record de novo. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). We thus apply the same "arbitrary and capricious" standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as did

---

[1] The government agreed to a voluntary stay of the contract award to DMC, and the Claims Court dismissed Tinton Falls' request for preliminary relief as moot.

the Claims Court. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); 28 U.S.C. § 1491(b)(4). In applying this standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010).

Here, Tinton Falls argues that the SBA-OHA lacked a rational basis for determining that the primary and vital requirements of the solicitation were the management and coordination of a package of lodging and transportation services. Contracting officers are entitled "to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* at 1286 (internal quotation omitted). "For that reason, procurement decisions invoke a highly deferential rational basis review." *Id.* (internal quotation omitted). Under this standard, we must sustain an agency's action unless the challenger can prove the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [issued a decision that] is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc. – Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

I

While the government does not seriously dispute that Tinton Falls has standing to pursue its bid protest, DMC contends that Tinton Falls lacks standing. To establish standing, Tinton Falls must show that it is an interested party that will be prejudiced by the award of the contract to DMC. *Info. Tech. & Applications Corp. v. United*

*States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). To establish prejudice, Tinton Falls must show there is a "substantial chance" it would have received the contract award but for the alleged error in the procurement process. *Id.* A party can establish a "substantial chance" it would have received a contract by showing that it was an actual or prospective bidder whose direct economic interest would be affected by the award of the contract or by failure to award the contract. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (citing *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Whether a party has standing is a question of law we review de novo. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009). The underlying question of prejudice ("substantial chance") is a factual question we review for clear error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).

DMC contends that Tinton Falls cannot show prejudice because 1) it does not qualify as a small business, and therefore could not compete in a reopened bid process unless that bid is solicited on an unrestricted basis, and 2) it did not intend to win the original contract. To support the first point, DMC emphasizes that the Area Office disqualified Mali, Tinton Falls, and their two related entities from the bidding process because they were not "small business concerns" for purposes of the solicitation. J.A. 2802–06. DMC therefore contends that Tinton Falls cannot show prejudice because it is not a "small business concern" eligible to compete for the solicitation. Thus, only one technically acceptable bid proposal remained— DMC's. The Claims Court rejected DMC's argument, finding that, among other things, there was a "distinct possibility" that if Tinton Falls were to succeed in proving that DMC was likewise ineligible, the government might be required to rebid the contract on an unrestricted basis, which would place Tinton Falls in the same position as

any other interested party.  J.A. 3774 (Tr. at 67:1–15).
We find no clear error in the Claims Court's conclusion.

In *Impresa Construzioni Geom. Domenico Garufi v.
United States*, we held that a bid protester had a "sub-
stantial chance" of receiving a contract—and therefore
standing to challenge the award of that contract—if, as a
result of a successful bid protest, the government would
be obligated to rebid the contract and the protester could
compete for the contract during the reopened bid.  238
F.3d 1324, 1334 (Fed. Cir. 2001).  Here, there is no ques-
tion that if Tinton Falls' bid protest succeeds, MSC would
be obligated to reopen the bidding process.  In particular,
if Tinton Falls were to prevail, DMC's relationship with
its subcontracted hotels would violate the ostensible
subcontractor rule and DMC would no longer qualify as a
small business concern for purposes of the solicitation.
Thus, *no* eligible small business would have submitted a
technically acceptable proposal during the initial bid
process.  With no eligible bidders remaining, MSC would
be required to reopen the bidding process.[2]

---

[2]    The dissent would reject Tinton Falls' standing
arguments on the ground that Tinton Falls had no "sub-
stantial chance" of securing the award because certain
companies that were disqualified earlier in the process
qualified as small business concerns, and one of them
would have been awarded the contract.  The dissent
states that regulation "obligate[s]" the government to
accept one of these companies' technically unacceptable
bids or at least to grant the companies an additional
opportunity to remedy their bids.  Dissent at 4.  But no
party to this case has taken the position that a regulation
requires the government to further consider these rejected
bids.  In fact, none of the briefing on appeal even raises
the possibility that the government would give any fur-
ther consideration to a deficient bid.  And for good rea-

What is less clear is whether Tinton Falls could compete for this hypothetical reopened bid. Tinton Falls concedes that for the purposes of the original solicitation, it is not a small business concern under the applicable NAICS code. Oral Argument at 41:10–30, *Tinton Falls Lodging Realty, LLC v. United States*, No. 2014-5140 (Fed. Cir. May 6, 2015), *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/14-5140/all. But all parties appear to agree that MSC would be obligated to evaluate whether it could still solicit the contract as a small business set-aside, or whether it would need to reopen the bidding process on an unrestricted basis. *See* Oral Arg. at 19:30–53 (Government: "If there's no offerors remaining—which would be the case if DMC is no longer the [contract] awardee—then the agency would have the obligation to evaluate, based upon the market research—which would have to be conducted—whether or not [the rebid contract] could be set aside for small businesses."). And although there is much speculation as to whether MSC would rebid the solicitation on an unrestricted basis—thus allowing Tinton Falls to compete for the contract—none of the parties disputes the Claims Court's finding that this is at least a realistic possibility.

DMC's allegation that Tinton Falls did not intend to secure the initial contract is not relevant to this analysis. In particular, we fail to see how Tinton Falls' initial bid strategy would prevent it from competing for the reopened bid, assuming that the contract were to be solicited on an unrestricted basis. To establish prejudice, Tinton Falls need not show it would *win* the contract in competition

---

son. Before rejecting these companies' proposals as technically unacceptable, the government gave them an additional chance to correct their deficiencies. These companies still failed to submit an acceptable proposal.

with other hypothetical bidders. *Myers*, 275 F.3d at 1370. Rather, all a protester must establish to demonstrate prejudice is that it has a substantial chance of receiving the contract—that it is a qualified bidder and could *compete* for the contract. *Id.* at 1370–71. The fact that Tinton Falls did not submit the lowest-priced bid of its affiliated entities during the initial bidding process does not preclude it from having a substantial chance of winning a hypothetical reopened bid for that contract, so long as the contract is solicited on an unrestricted basis instead of as a small business set-aside.

In short, the question of standing hinges on whether Tinton Falls could compete for a reopened bid if it wins its protest of the initial contract award. The factual core of this question is whether, after having not received any technically acceptable proposals from eligible small businesses in response to its initial solicitation, MSC would maintain the contract as a small-business set-aside, or reopen the bidding process on an unrestricted basis. Both DMC and Tinton Falls agree that nothing in the record definitively answers this question, and both parties merely speculate as to the parameters of the hypothetical reopened bid for the contract. The government—which does not appeal the Claims Court's denial of its motion to dismiss for lack of standing—conceded at oral argument there is a sufficient probability MSC would reopen the bid on an unrestricted basis so that Tinton Falls *would* have a "substantial chance" of winning the reopened solicitation. Oral Arg. at 22:35–42 (Court: "If you assume that this court rules against your position on the merits, then would [Tinton Falls] have a substantial chance?" Government: "Correct."). Nevertheless, we need not engage in further speculative inquiry about what might happen. Our review of this aspect of the Claims Court's decision requires us merely to determine whether the court clearly erred by finding that Tinton Falls could compete for the reopened bid if it prevails in its protest of the initial

contract award. *See Bannum*, 404 F.3d at 1354. Based on the record, we are unable to find clear error in the Claims Court's factual determination that Tinton Falls has demonstrated prejudice.[3]

## II

Proceeding to the merits, at issue here is a narrow challenge to the Claims Court's determination that DMC's relationships with its subcontracted hotels did not violate the ostensible contractor rule, and thus did not disqualify DMC as a small business concern under the solicitation and preclude award of the contract to DMC. Congress has given SBA the exclusive authority to establish definitions and standards for determining whether an entity qualifies as a "small business concern" for purposes of federal law. 15 U.S.C. § 632(a)(2)(A). Determinations under SBA's regulations are binding on federal procurement officers. 15 U.S.C. § 637(b)(6). Qualifying as a "small business concern" for the purpose of a bid proposal may have several advantages. *See* 13 C.F.R. § 121.401. For example, solicitations for certain government procurements, like the solicitation here, are limited to "small business concerns."

---

[3] We need not determine whether, in all circumstances, a protester can "compete" for a reopened bid for the purposes of standing under *Impresa* when the protester was not a qualified bidder for the initial bid and would be a qualified bidder for the reopened bid only if the contract was solicited with substantially different eligibility requirements. We hold only that under the particular facts of this case, the Claims Court did not clearly err in finding that Tinton Falls had a substantial chance of winning a reopened bid should it prevail in its bid protest.

When an agency issues a solicitation for a small business set-aside contract, it must select an NAICS code for that contract, "which best describes the principal purpose of the product or service being acquired." 13 C.F.R. § 121.402(a)–(b). Each NAICS code is associated with a number of employees or amount of annual receipts, both of which limit the size of a business that can qualify as a small business for purposes of the contract. 13 C.F.R. § 121.201. Pertinent to the inquiry here are the regulations relating to affiliated businesses. Even if a business falls within the employee and annual receipt limits of the applicable NAICS code, it may fail to qualify as a small business for purposes of the contract if it is affiliated with other entities. A business is affiliated with another business when "one controls or has the power to control the other." 13 C.F.R. § 121.103(a)(1). In determining affiliation, SBA considers factors such as ownership, common management, previous relationships with or ties to another concern, contractual relationships, and joint ventures between entities. 13 C.F.R. § 121.103(a)(2), (c)–(h). Businesses are treated as joint venturers—and therefore affiliates—when a subcontractor "performs primary and vital requirements of a contract . . . or [is] a subcontractor upon which the prime contractor is unusually reliant." 13 C.F.R. § 121.103(h)(4). This is referred to as the "ostensible subcontractor" rule. *See id.* ("A contractor and its ostensible subcontractor are treated as joint venturers.").

Here, Tinton Falls does not allege that DMC will be "unusually reliant" on a subcontractor in order to perform the contract. Rather, as discussed above, Tinton Falls challenges only the SBA-OHA's determination that the primary and vital requirements of the solicitation are a coordinated package of hotel and transportation services. Tinton Falls contends that the primary and vital requirement of the solicitation is the provision of lodging services itself, and does not include the management and

coordination of lodging and transportation services to meet MSC's needs. According to Tinton Falls, the solicitation does not require bidders to provide a management plan or detail how subcontractors will be managed. Rather, much of the statement of work in the solicitation is devoted to criteria relating to minimum requirements for hotels. *See* J.A. 248–51, 253–55. Tinton Falls cites to the chosen NAICS code to support its position that lodging services are the primary purpose of the solicitation. Specifically, Tinton Falls notes that the MSC contracting officer chose NAICS code 721110 ("Hotels (except Casino Hotels)"), rather than the other NAICS codes that appear to describe management services, such as NAICS codes 541611 ("Administrative Management & General Management Consulting Services") and 561990 ("All Other Support Services"). Tinton Falls concludes that the SBA-OHA lacked a rational basis for its determination that management and coordination of the lodging and transportation services is the primary and vital requirement of the contract.

Tinton Falls contends that when the primary and vital requirements of the solicitation are properly defined as lodging services, DMC's relationships with its subcontracted hotels violate the ostensible contractor rule. The SBA-OHA estimated that the cost of hotel rooms accounts for about 80% of the contract value. J.A. 3551. DMC does not own any hotels and intends to subcontract the provision of these hotel rooms to several different hotels. J.A. 3550. And because at least the primary hotel subcontracted by DMC does not qualify as a small business for purposes of the solicitation, J.A. 3452, Tinton Falls concludes that DMC cannot be considered a "small business concern" for purposes of the solicitation because, pursuant to 13 C.F.R. § 121.103(h), it is a joint venturer with, and an affiliate of, the subcontracted hotels.

We disagree with Tinton Falls that the SBA-OHA lacked a rational basis for determining the primary and

vital requirements of the solicitation. Contrary to Tinton Falls' characterization, the solicitation requires more than simply a fixed block of hotel rooms for a certain period of time; rather, the contractor must be able to secure an unpredictable and widely-varying number of acceptable hotel rooms on short notice. For example, the solicitation estimates that MSC will require around 65 hotel rooms per night, but warns that in the past, MSC's needs have fluctuated between 25 and 120 rooms per night. J.A. 248. And while the contractor is required to "ensure a sufficient number of single rooms are available at all times to meet the Government's needs," MSC will pay only for the number of rooms each night used to house CIVMARs attending training. J.A. 248–49. Further, the contractor is expected to "make every effort" to provide rooms within one hour of CIVMAR arrivals. *Id.* And MSC is not required to provide advance notice of its daily room requirements to the contractor. *Id.* Thus, even though no management and coordination tasks are expressly identified, there is no question that the solicitation requires management and coordination to supply a potentially large and varying number of hotel rooms with little or no notice.

Tinton Falls also minimizes the requirement that the contractor must provide all transportation to and from the hotels and the MSC Training Center. J.A. 250. The number of trips required by MSC is based on CIVMAR training class schedules, which can vary. *Id.* And as with the lodging services, MSC will pay only for the actual number of trips provided between the hotels and the training center. J.A. 251. In addition, the contractor must provide various other services relating to the lodging and transportation of CIVMARs, such as ensuring that all CIVMARs check in each night and maintaining logs of all passengers who use the provided transportation services. *Id.* Further, the contractor is required to be the single point of contact for the MSC, and must be available to be

contacted by the MSC at all times. J.A. 247. DMC intends to allocate two of its employees to perform the majority of the labor associated with these management and coordination tasks. J.A. 3549.

The record supports this interpretation of the solicitation's requirements. After reviewing the scope of work in the solicitation, the Area Office explained that the contract involved "more than a place to stay and a bus ride to and from the [MSC] training facility"—rather, the contract was "for an overall package of rooms, transportation[,] and services." J.A. 3459. The Area Office noted that "[t]he number of CIVMARs that attend [MSC] trainings varies constantly and the contract requires the contractor to monitor, control, record[,] and report the changing needs of [MSC] for lodging and transportation." *Id.* Thus, it found that the primary and vital element of the solicitation was the *coordination* of lodging, transportation, and other services to MSC. *Id.*

The SBA-OHA agreed with the Area Office's identification of the primary and vital requirements of the solicitation. J.A. 3560. Finding Tinton Falls' characterization of the solicitation as "merely a hotel contract [to be] a gross simplification," it instead described the coordination of hotel rooms and transportation to meet MSC's needs as the most complex task in the solicitation. J.A. 3561. The Claims Court agreed with the SBA-OHA, finding that its characterization of the primary purpose of the contract as a "coordinated package of rooms, transportation, and services" was not "irrational," because the "element of coordination of hotel and transportation [services] is vital." J.A. 3774 (Tr. at 67:20–25). It noted that there were at least some management functions that "simply picking up the phone and calling for a taxi or a hotel room would not furnish," such as the required coordination between MSC, the hotels, and the transportation services, and the daily logs monitoring the whereabouts of the CIVMARs. *Id.* (Tr. at 68:12–21). The Claims Court

concluded that the scope of work in the solicitation made clear that MSC was "buying the right to send people to a single point of contact knowing that they [we]re going to be taken care of in terms of meals, hotel rooms, and transportation." *Id.* (Tr. at 68:22–25).

In short, Tinton Falls fails to meet its high burden of showing that the SBA-OHA's determination lacked a rational basis. The SBA-OHA evaluated the scope of work and other contract requirements in the solicitation and provided a coherent and reasonable explanation of how it determined that the primary and vital requirements of the contract were the management and coordination of a package of lodging and transportation services.

* * *

We have considered the parties' remaining arguments and find them unpersuasive.

CONCLUSION

Because there is a rational basis for the SBA-OHA's determination that the primary and vital requirements of the solicitation are the management and coordination of a package of lodging and transportation services, the Claims Court's grant of the government and DMC's motion for judgment on the administrative record was not arbitrary and capricious.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

_____

**TINTON FALLS LODGING REALTY, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
**DMC MANAGEMENT SERVICES, LLC,**
*Defendants-Appellees*

_____

2014-5140

_____

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00353-EGB, Senior Judge Eric G. Bruggink.

_____

REYNA, *Circuit Judge*, dissenting.

Because Tinton Falls has not established by preponderant evidence that it has a direct economic interest in the solicitation, I respectfully *dissent* from the majority's decision to reach the merits of this case.

The standing question in this case is governed by 28 U.S.C. § 1491(b)(1), which "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Section 1491(b)(1) allows an "interested party" to object "to a solicitation . . . for bids or proposals for a proposed contract" or to "any alleged violation of statute or regulation in connection with a procurement or proposed pro-

curement." Standing under § 1491(b)(1) "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

As the bid protester, Tinton Falls bears the burden of establishing the elements of standing. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Because standing is an "indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). General allegations of standing may suffice at the pleading stage, but facts supported by affidavits or other evidence are required at summary judgment. *Id.* Those facts must be "supported adequately by the evidence adduced at trial." *Id.* (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

Tinton Falls' bid protest progressed to trial on the administrative record, and facts establishing standing should have been adequately supported by the record. *See* J.A. 3774. Judgment on the administrative record is the final stage in a bid protest and requires the Court of Federal Claims "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005). Tinton Falls was therefore required to establish by preponderant evidence that it had a direct economic interest in the solicitation. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (Once standing is called into question, the party asserting

standing "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").[1]

Tinton Falls could have conceivably met its burden in one of two ways. As the majority notes, an actual bidder such as Tinton Falls can demonstrate that it would have had a "substantial chance" of securing the original contract if not for an alleged error in the procurement process. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009). Tinton Falls could have also demonstrated that a successful protest would obligate the government to rebid the contract and that Tinton Falls would be qualified to compete on the rebid. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001).

The record evidence, however, leaves no question that Tinton Falls would not have secured the original contract. Tinton Falls is other than small and does not qualify to compete for a small business set-aside contract. *See* J.A. 2808–10 (Notice to Tinton Falls that "[t]he Small Business Administration (SBA) has made a formal size determination that your business is other than small"). Even if the government removed the small business set-aside and issued a revised, unrestricted solicitation, the record indicates that two other small businesses submitted lower bids than Tinton Falls and would have been next in line to receive the original contract.

---

[1] Tinton Falls had the same burden in the Court of Federal Claims because "[t]he Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III." *Weeks Marine*, 575 F.3d at 1359 (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)).

Nor has Tinton Falls established through preponderant evidence that a successful protest would obligate the government to rebid the contract as unrestricted or that Tinton Falls is qualified to compete on rebid. *Cf. Impresa*, 238 F.3d at 1333. To the contrary, the record suggests that the government would *not* be obligated to rebid. Excluding DMC and the four other than small businesses associated with Hotels Unlimited, the record indicates that three proposals remained in the competitive range. Those three proposals were submitted by offerors that self-certified as small businesses. Given that two or more offers from small businesses remained in competitive range, the government would have been obligated to award the contract to the next small business in line, or at least obligated to request revised proposals from the three offerors that remained in competitive range. *See* FAR § 19.502-2 (requiring an acquisition such as the one at issue here to be set aside for small business absent "a reasonable expectation" of obtaining offers from responsible small businesses).

Court of Federal Claims precedent should have guided the standing question in this case. In *International Management Services, Inc. v. United States*, the Court of Federal Claims held that a bid protestor lacked standing to challenge a small business set-aside contract because the protester had been deemed other than small. 80 Fed. Cl. 1, 4–8 (2007). On those facts, "there is no chance, much less a substantial chance, that plaintiff could be awarded the contract in the event that the [government's] contract with defendant-intervenor is set aside." *Id.* at 6. The protester made an argument identical to the one Tinton Falls makes here, arguing the defendant-intervenor and the remaining offerors were themselves unqualified. *Id.* The protester thus argued that if the Court of Federal Claims sustained its protest and found that "no offeror was small, . . . the government would be obligated to rebid the contract (using full and open compe-

tition), and [it] could compete for the contract once again." *Id.* (quoting Pl.'s Opp'n Def.'s Mot. Dismiss at 22) (alterations in original). The Court of Federal Claims rejected that argument because, like here, there remained a small business in competitive range. *Id.* at 6–7; *see also Taylor Consultants, Inc. v. United States*, 90 Fed. Cl. 531, 541–43 (2009). Under *International Management Services*, the Court of Federal Claims should have found that Tinton Falls lacked standing.

The fact that the three remaining small businesses in competitive range originally submitted technically unacceptable proposals is insufficient to establish Tinton Falls' standing. The technical unacceptability of an otherwise qualified offer in competitive range does not limit the offeror's ability to establish a substantial chance of winning a contract. *See Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37–38 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011). Even if the technical unacceptability of the remaining small business offers required the government to reassess whether two or more technically acceptable small businesses remained, the record indicates that seven additional vendors were interested in the solicitation. We cannot presume from the record that those seven additional vendors are other than small or that those vendors would submit technically unacceptable offers in the future. Nor can we presume that the three remaining small businesses in competitive range would be incapable of submitting technically acceptable proposals on rebid. As far as the record reveals, Tinton Falls failed to make any allegation to the contrary. *See* J.A. 3566–67 (Complaint). It had the burden to do so.

Only in a future hypothetical world in which the government found no two eligible small businesses could Tinton Falls compete on rebid. Yet Article III standing, and by extension the more demanding standard provided by § 1491(b)(1), requires more than speculation or abstract hypotheticals. Article III standing requires an

"alleged (and ultimately proved) . . . 'injury in fact'—a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal quotation marks omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Nothing in the record suggests that a future rebid or Tinton Falls' competition on such a rebid is even a possibility, much less a substantial chance. The Court of Federal Claims' finding to the contrary is clearly erroneous.

The majority rests its analysis of standing in part on the fact that the government does not "seriously dispute" that Tinton Falls has standing, Maj. Op. at 8–9, and that "none of the parties disputes the Claims Court's finding that [Tinton Falls' future competition] is at least a realistic possibility," *id.* at 11. Yet a party's lack of argument or concession regarding standing is irrelevant. Standing is a nonwaivable jurisdictional requirement. *Citizens for a Better Env't*, 523 U.S. at 102–04; *Myers*, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue"). Because the record is void of preponderant evidence establishing this jurisdictional requirement, I respectfully *dissent*.