# United States Court of Appeals for the Federal Circuit

---

**AGILE DEFENSE, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**FEDITC, LLC,**
*Defendant*

---

2019-1954

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01615-LAS, Senior Judge Loren A. Smith.

---

Decided: June 2, 2020

---

STEPHANIE WILSON, Berenzweig Leonard LLP, McLean, VA, for plaintiff-appellant. Also represented by TERRENCE O'CONNOR.

BARBARA E. THOMAS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by JOSEPH H. HUNT, MARIANA TERESA ACEVEDO, WILLIAM JAMES GRIMALDI, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE.

---------------

Before REYNA, MAYER, and TARANTO, *Circuit Judges.*

MAYER, *Circuit Judge.*

Agile Defense, Inc. ("Agile") appeals the judgment of the United States Court of Federal Claims granting the government's motion for judgment on the administrative record and concluding that the United States Defense Information Systems Agency ("DISA") did not contravene the terms of the solicitation when it reviewed the supporting documentation for certain proposed cost-reimbursement ("CR") labor rates. *See Agile Def., Inc. v. United States*, 143 Fed. Cl. 10 (2019) ("*Federal Claims Decision*").  We affirm.

## I. BACKGROUND

### A. The Encore III Solicitation

On March 2, 2016, DISA issued a solicitation for Encore III, a procurement designed to "provid[e] information technology . . . solutions for the development, installation, fielding, training, operation and life-cycle management of components and systems in the operational environments of Combatant Commands and their subordinate components, the military services, Defense agencies, Office of the Secretary of Defense . . . and other Federal agencies." A. 1145; *see also* A. 1132–43.  The solicitation stated that DISA would award a series of indefinite delivery/indefinite quantity contracts, A. 1145, and that task orders issued under the contracts would provide for payment on either a CR or a fixed-price ("FP") basis.  A. 1142, 1145–47.

The solicitation identified 116 labor categories ("LCATs") that a contractor would likely be required to staff in order to perform the various types of work required by task orders issued under an Encore III contract. A. 1263–65, 1282–313.  DISA provided a description of the duties associated with each of the 116 LCATs; it also set

forth the minimum education and experience requirements for each category.  A. 1282–313.

The Encore III solicitation further provided that DISA would make awards to the offerors of the lowest-priced, technically-acceptable proposals after considering three evaluation factors: (1) technical/management approach; (2) past performance; and (3) cost/price.  A. 1270–80.  Each prospective offeror was instructed to provide a "cost/price volume" in its proposal.  A. 1256.  In this volume, the offeror was required to include a "pricing template," which listed the estimated hourly costs for which the offeror expected to claim reimbursement under a CR task order for the labor associated with each of the 116 LCATs.  A. 1263.  Each offeror was also required to submit "supporting cost information" for all proposed CR labor rates.  A. 1263; *see also* A. 1264 ("The offeror must provide the pricing methodology and supporting cost information utilized in the development of all CR rates.").

The solicitation provided for the award of Encore III contracts to two distinct sets or "suites" of twenty offerors. A. 1252.  One suite was open to offerors of any size, whereas the other suite was limited to offerors who qualified as small-business concerns.  A. 1252.

### B. The Cost Realism Analysis

The solicitation stated that DISA would "perform a cost realism analysis on the proposed CR labor rates in accordance with [Federal Acquisition Regulation ("FAR")] 15.404-1(d) to determine the Most Probable Cost for each Offeror." A. 1280.  It further provided that:

> The cost/price team will develop an average for each CR labor rate utilizing the proposed CR rates on the 'CR Labor Rate Table' tab from ALL complete proposals within each suite (Full and Open and Small Business).  The team will then calculate the standard deviation of the average for each CR

labor rate.  The Defense Procurement Acquisition Policy Contract Pricing Reference Guidelines (Volume 2) detail the use of statistical analysis, including standard deviation, to organize, summarize, analyze, and interpret data for contract pricing. Standard deviation quantifies the amount of variation amongst a set of data.  In a normal distribution, 1 standard deviation will include the data that is 34.1% below or above the average.  Therefore, with normal distribution, 68.2% of the data will be within 1 standard deviation of the average.  The Government considers a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404.  The initial calculations for [the] Average and Standard Deviation will be utilized for the entirety of the evaluation and will not be recalculated if a competitive range is set.

If an offeror's proposed CR labor rate is more than 1 standard deviation below the average for that labor rate, the Cost/Price Team will review the submitted supporting documentation at the component level for that rate.  If it is determined that the supporting documentation supports the realism of the proposed rate, no adjustment will be made to the offeror's rate.  If inadequate or no justification is provided by the offeror for any component of that rate . . . the Government will adjust the fully burdened CR Labor rate to be equal to the average for purposes of calculating the Most Probable Cost for that offeror.

A. 1280 (emphasis omitted).

### C. Evaluation of Agile's Proposal

Agile submitted a proposal in the small-business suite. On April 24, 2018, the Encore III contracting officer sent letters to all small-business offerors, including Agile,

announcing that the agency's discussions with offerors had concluded and that each offeror should provide its final proposal revision ("FPR") to the agency by May 2, 2018. A. 2415–16. During its review of Agile's FPR, DISA determined that many of its proposed CR rates fell more than one standard deviation below average rates ("Below-Deviation Labor Rates"). A. 2658–59. DISA further determined that for these Below-Deviation Labor Rates Agile had based its proposed rates on salaries paid to pools of workers which included workers who did not meet minimum solicitation requirements. *See, e.g.*, A. 298–99, 2439, 2658–60.

Concerned that Agile's overall pricing methodology might be defective, A. 2659–60, DISA expanded its review to Agile's proposed CR labor rates that fell within one standard deviation of the average rates ("Within-Deviation Labor Rates"). A. 2660, 2664–65, 2765–66. It sent Agile an evaluation notice stating that the rates it proposed for a total of sixty-six LCATs were based upon salaries paid to pools of workers which included workers not meeting the solicitation's minimum education and experience requirements. A. 2765–67. In response, Agile submitted a second FPR in which it indicated that it had "updated all the salary surveys for the labor categories the Government included in" its evaluation notice. A. 2802.

In revising its proposal, Agile increased many of its proposed CR rates. A. 2612–13, 3003–04. Ultimately, its final proposal yielded a "total evaluated price" that was too high to place it among the twenty lowest-priced, technically-acceptable offerors in the small-business suite. A. 3106–07, 3118; *see also* A. 1281 (explaining that an offeror's "total evaluated price" would be calculated by adding its proposed FP rates to its adjusted proposed CR rates). Agile was therefore not selected for a contract award. A. 3107.

### D. Agile's Bid Protest

Agile filed a protest in the Court of Federal Claims on October 18, 2018. A. 19. It argued that DISA violated the terms of the solicitation by expanding "its cost realism analysis to all labor rates in Agile's [FPR], regardless of whether they were more than one standard deviation below the average." *Federal Claims Decision*, 143 Fed. Cl. at 17 (citation and internal quotation marks omitted). The Court of Federal Claims rejected this argument, however, concluding that it was "clear from the Solicitation that the Agency did not limit itself to only performing cost realism analysis on labor rates that were more than one standard deviation below the average." *Id.* at 18. The court determined, moreover, that "the only limitation within the Solicitation regarding cost realism analysis was the *requirement* that the Agency perform cost realism analysis on CR labor rates that were more than one standard deviation below the average." *Id.*

Agile then filed a timely appeal with this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Standard of Review

"Interpretation of [a bid] solicitation is a question of law that is reviewed de novo." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (alteration in the original) (citation and internal quotation marks omitted). This court reviews the merits of a bid protest pursuant to the standards of the Administrative Procedure Act ("APA"). *See* 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706); *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331–32 (Fed. Cir. 2018). This means that "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi*

*v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Banknote Corp. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

## B. Cost Realism

The FAR defines a "[c]ost realism analysis" as "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1); *see also id.* § 2.101. An agency is required to conduct a cost realism analysis on all CR contracts in order "to determine the probable cost of performance for each offeror." 48 C.F.R. § 15.404-1(d)(2). As the Court of Federal Claims has correctly recognized, "[p]rice reasonableness generally addresses whether a price is too high, whereas cost realism generally addresses whether a cost estimate is too low." *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004); *see* 48 C.F.R. § 15.404-1.

## C. Scrutiny of Within-Deviation Labor Rates

Agile contends that DISA's cost realism analysis "violated the express terms of the [Encore III solicitation]." Appellant Br. 18. In support, it argues that while the solicitation required DISA to review and evaluate an offeror's supporting documentation for Below-Deviation Labor Rates, it prohibited expanded scrutiny of an offeror's Within-Deviation Labor Rates. According to Agile, it would have been selected for a contract award had DISA "adhered to the Solicitation's express terms and found [its Within-

Deviation Labor Rates] realistic by virtue of being within one standard deviation of the average." *Id.* at 40–41.[*]

We do not find this argument persuasive. The Encore III solicitation required DISA to assess each offeror's proposed CR rates "using one or more techniques defined in FAR 15.404" in order to determine whether those rates were "complete, reasonable, and realistic." A. 1279. It also instructed the agency to calculate, based upon an examination of all completed proposals in each suite of offerors, the average proposed labor rate for each LCAT. A. 1280. Next, the agency was directed to use statistical analysis to divide each offeror's estimated CR labor rates into two groups: Below-Deviation Labor Rates, i.e., rates that were more than one standard deviation below the average rates, and Within-Deviation Labor Rates, i.e., rates that fell within

---

[*] "A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms prior to the close of the bidding process." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (citation and internal quotation marks omitted). Here, the government makes a cursory argument that Agile waived its right to argue that DISA was prohibited, under the terms of the solicitation, from analyzing the supporting documentation for its Within-Deviation Labor Rates because it failed to seek clarification on that issue prior to the submission of the last round of proposals. *See* Appellee Br. 27. Because the government fails to adequately develop this argument, however, we decline to consider it on appeal. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (concluding that an insufficiently developed argument was waived); *see also Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 973 n.4 (Fed. Cir. 2006) (concluding that a litigant waived an argument by failing to adequately address it in the "argument section" of its brief).

one standard deviation of the average rates.  A. 1280.  The solicitation further stated that DISA was required to "review the submitted supporting documentation" for each Below-Deviation Labor Rate and, if the documentation provided "inadequate or no justification . . . for any component of that rate," the agency was directed to make adjustments to that rate when calculating the "Most Probable Cost" for each offeror.  A. 1280.

Contrary to Agile's assertions, however, nothing in the Encore III solicitation prohibited DISA from evaluating an offeror's supporting documentation for Within-Deviation Labor Rates.  Agile's argument that the agency was barred from conducting an expanded cost realism analysis on its Within-Deviation Labor Rates hinges on the following solicitation provision: "The Government considers a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404."  A. 1280.  According to Agile, this statement means that DISA was required to accept all Within-Deviation Labor Rates as "realistic" and was therefore prohibited from performing any further cost realism analysis on those rates.

Agile's truncated reading falls flat.  The solicitation does not state that Within-Deviation Labor Rates must be deemed "realistic," but rather that those rates will be considered "realistic . . . *subject to cost analysis techniques in accordance with FAR 15.404.*"  A. 1280 (emphasis added).  In other words, Within-Deviation Labor Rates are not per se realistic, but instead may undergo additional cost realism scrutiny pursuant to the various cost analysis methods and procedures sanctioned by the FAR.  *See Federal Claims Decision*, 143 Fed. Cl. at 18–19 ("[T]he language in the Solicitation was not so limited as to prevent the Agency from performing cost realism analysis on labor rates that fell within one standard deviation of the average.").

In this regard, the Encore III solicitation specifically states that DISA was required to assess the "[CR] portion" of each offeror's proposal to determine whether it was "realistic." A. 1279. Agile points to nothing in the language of the solicitation—or in the FAR—that limited DISA's authority to thoroughly assess the cost realism of the entire "[CR] portion" of its proposal, including its Within-Deviation Labor Rates.

Agile contends that because the solicitation explicitly required DISA to review the supporting documentation for Below-Deviation Labor Rates, it implicitly precluded the agency from extending that review to other proposed rates. *See* Appellant Br. 18–20, 26–29. We disagree. As we have repeatedly recognized, "[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa*, 238 F.3d at 1332 (citation and internal quotation marks omitted); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015); *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). Agile cites to no authority suggesting that a solicitation, by instructing a contracting agency to perform a rigorous cost analysis on certain proposed rates, thereby strips it of the power to conduct an expanded cost realism analysis on other proposed rates. To the contrary, such a rule would unduly circumscribe a contracting officer's discretion and hamstring a contracting agency's efforts to ensure that the "estimated proposed cost elements are realistic for the work to be performed," 48 C.F.R. § 15.404-1(d)(1).

The regular view of the Court of Federal Claims, which we approve, is that contracting agencies enjoy wide latitude in conducting the cost realism analysis. *See, e.g.*, *Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a

particular methodology in a solicitation." (citation and internal quotation marks omitted)); *Dellew Corp. v. United States*, 128 Fed. Cl. 187, 194 (2016) ("The Agency has demonstrated that it considered the information available and did not make irrational assumptions or critical miscalculations. To require more would be infringing on the Agency's discretion in analyzing proposals for cost realism." (citation and internal quotation marks omitted)); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)). Such an approach comports with the FAR, which provides examples of cost analysis techniques, but does not mandate the use of any specific methodology. *See* 48 C.F.R. § 15.404-1(c). Instead, it instructs that "[t]he Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition." *Id*. § 15.404-1(c)(2); *see also id*. § 15.404-1(d)(2)(i) (explaining that a cost realism analysis "should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal").

## D. Rational Basis Review

Finally, we reject Agile's argument that a reading of the solicitation that would allow DISA to conduct an expanded cost realism analysis on Within-Deviation Labor Rates would "lead to [an] inexplicable result" because it would "permit[] DISA to subject a rate that is $0.01 below the average rate to much higher scrutiny than a rate that is significantly more than one standard deviation below the average." Appellant Br. 31. As noted previously, we adhere to APA standards when reviewing post-award bid protests, *see* 5 U.S.C. § 706, and must set aside a contract award that does not evince rational reasoning. *See, e.g.*, *Savantage*, 595 F.3d at 1285 ("In a bid protest case, an agency's action must be set aside if it is arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."). Because an agency's procurement evaluations are always subject to review under APA standards, there is no merit to Agile's contention that permitting DISA to analyze the supporting documentation for an offeror's Within-Deviation Labor Rates would give it free rein to conduct a cost realism analysis that lacked a rational basis or otherwise led to "inexplicable result[s]," Appellant Br. 31.

## III. CONCLUSION

We have considered Agile's remaining arguments but do not find them persuasive. Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

**AFFIRMED**