# United States Court of Appeals for the Federal Circuit

---

**ALLEN R. BRAUN,**
*Petitioner*

**v.**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2019-1949

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-16-0743-I-2.

---

Decided:  December 21, 2020

---

GEORGE CHUZI, Kalijarvi, Chuzi, Newman & Fitch, PC, Washington, DC, argued for petitioner.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by JEFFREY B. CLARK, TARA K. HOGAN, ROBERT EDWARD KIRSCHMAN, JR.

---

Before NEWMAN, DYK, and TARANTO, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* TARANTO.

Dissenting opinion by *Circuit Judge* NEWMAN.

TARANTO, *Circuit Judge*.

Dr. Allen Braun worked at the National Institutes of Health (NIH) for almost 32 years as a research doctor with a specialty in neurological disorders, and he had tenured status since 2003. In 2016, the NIH, which is located within the U.S. Department of Health and Human Services, removed Dr. Braun from his position after an audit revealed that his records were incomplete for all but 9% of the human subjects who had participated in his research over the course of six years. Dr. Braun challenged that decision before the Merit Systems Protection Board (Board), arguing that an NIH policy required de-tenuring of tenured scientists (which NIH had not done in his case) before they could be removed for performance-related reasons and that the NIH committed certain other errors. The Board ruled that Dr. Braun's removal was proper under a provision of the cited NIH policy that allows removal "for cause" without de-tenuring, and it also rejected Dr. Braun's other challenges. *Braun v. Dep't of Health & Human Servs.*, No. DC-0752-16-0743-I-2, 2019 WL 1047556 (M.S.P.B. Feb. 28, 2019). We affirm.

I

A

Having worked as a research doctor at the NIH since the mid-1980s, Dr. Braun in 2003 became a tenured Senior Investigator for the National Institute on Deafness & Other Communication Disorders (Deafness Institute), a branch of the NIH. *See* J.A. 69–71 (describing "The Tenure Process"). He was the principal investigator for protocol study 92-DC-0178, which studied the effect of trauma on speech and language. Study participants were subjected to speech and language tests (by interview and by computer), hearing tests, electroencephalography, magnetoencephalo-

graphy, electromyography, and magnetic resonance imaging (MRI).

Because his research involved human subjects, Dr. Braun submitted a standard research protocol to an NIH Institutional Review Board (IRB), a body operating with considerable independence from management and having as its primary purpose the protection of human subjects of study. J.A. 186; *see also* J.A. 172–75, 198. As approved by the IRB, Dr. Braun's protocol for screening subjects of the 92-DC-0178 study required an informed-consent form, a requirement to take a medical history from and conduct a physical examination of each subject, and an eligibility-screening questionnaire. *See* J.A. 156. The informed-consent form provided subjects with an overview of the study's risks, which were designated as minimal to none, apart from the MRIs. J.A. 158. The consent form explained that MRIs are associated with risks for subjects with pacemakers and electrical-device implants and that "[i]t is not known" whether MRIs are "completely safe for a developing fetus." *Id.* Accordingly, Dr. Braun's protocol also required female subjects within a specified age range to receive a pregnancy test. *Id.*

In March 2015, Dr. Braun notified his clinical director at the Deafness Institute that a deviation from the protocol had resulted in the running of an MRI scan on the wrong patient. After some initial reviews, the Deafness Institute retained an independent company to conduct an audit of Dr. Braun's records. The IRB—which had begun its own review of Dr. Braun's records—postponed its review until completion of the audit commissioned by the Deafness Institute.

The audit was completed in February 2016. J.A. 129. The auditors reviewed records from 424 subjects included in Dr. Braun's study (going back to 2009) to determine whether Dr. Braun had met the protocol's requirements for each one. J.A. 131 n.1. The results indicated that 14

subjects (3%) had either no informed-consent form (2 subjects) or an unacceptable consent form on file.  J.A. 143.  In addition, only about half (213 of the 424 subjects) of the participants had acceptable medical-history and physical-exam documentation: For some, there was no record that they had undergone history and physical screening, while for others the records were not signed by Dr. Braun (as required by the protocol).  J.A. 144.  Only 55% of the subjects had eligibility-screening questionnaires on file; and of those, only 26% had completed questionnaires.  J.A. 145.  Overall, complete records existed for only 38 of the 424 subjects—less than 9% of the participants whose records were reviewed.  J.A. 147.

Given the audit results, the IRB determined that Dr. Braun's deviations from protocol constituted "serious, continuing non-compliance," and it suspended the study, while noting that the study could resume after "appropriate remediation."  J.A. 84–85.  The IRB permitted Dr. Braun to submit a plan for remediation, which he did on May 12, 2016.  J.A. 86.

The following day, Dr. Braun received from Dr. Andrew Griffith, the Deafness Institute's Scientific Director, a Proposal to Remove him from his position at the NIH.  J.A. 27–31 (Removal Proposal).  The Proposal charged Dr. Braun with "[n]egligence in the performance of [his] duties" based on the audit results, which "demonstrated a pattern of repeated deviations from the requirements of [Dr. Braun's] approved protocol, NIH medical records policy, and accepted standards of medical practice."  J.A. 28.  The Proposal further explained that Dr. Braun's deviations from protocol—including having complete records for less than 9% of his subjects—"indicate[d] a consistent and continuous pattern o[f] gross negligence" and "could have exposed subjects to unnecessary harm and impacted the integrity of the research being conducted."  J.A. 29.  Those deviations

"ma[de] it impossible for [Dr. Braun's] supervisors to trust" him to carry out his duties. *Id.*

On the same day (May 13, 2016) that he received the Proposal, Dr. Braun (through counsel) contacted Timothy Wheeles, Executive Officer for the Deafness Institute, who was to make the final removal decision. J.A. 39–40. He argued that the NIH had failed to follow its own policy in sending the Removal Proposal—specifically, the NIH Policy on Performance Management, Disciplinary Actions and Administrative Removals for Title 42 Employees (NIH Policy). J.A. 62–73. Critically for present purposes, that Policy provides that "[t]enured scientists must undergo the de-tenuring process before a performance-based action may be taken against them," NIH Policy § H(1), while permitting the agency to forgo the de-tenuring process when it removes tenured employees "for cause, *e.g.*, personal or scientific misconduct," NIH Policy § L(1). J.A. 67, 71. After receiving no response, Dr. Braun submitted his Written Reply to the Removal Proposal on June 3, 2016.

Ten days later, Mr. Wheeles announced his Decision on Proposed Removal, removing Dr. Braun for negligence in the performance of his duties. J.A. 32–38 (Removal Decision). He noted that the decision to remove Dr. Braun was based on the information set forth in the Removal Proposal, including its supporting documentation (*i.e.*, the NIH Policy, the NIH Table of Penalties, which recommends appropriate penalties for employee misconduct, and the independent audit results), as well as Dr. Braun's Written Reply. J.A. 32–35. Mr. Wheeles also conducted a penalty analysis in accordance with *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). Although he found that Dr. Braun's length of tenure and lack of previous employment problems were mitigating factors, he ultimately rejected Dr. Braun's argument that deviations from his protocol did not increase the risks to his patients, stating that, because of the magnitude of the protocol violations,

"there is no way to prove the validity and reliability of your research"; "you repeatedly failed to follow the requirements of the protocol, which is in place for the safety of the patients and the credibility of the research"; and "[t]his misconduct could tarnish the reputation of the [Deafness Institute] and the NIH." J.A. 35. Mr. Wheeles concluded: "Based on the serious, continuing non-compliance with your study protocols for at least the past six years, I have no confidence or trust in you to lead and manage a research study and staff, to publish with integrity, or to represent the [Deafness Institute] and NIH." *Id.* (emphasis omitted). The Removal Decision, dated June 13, 2016, stated that removal would not become effective until June 25, 2016. J.A. 33.

Knowing that Dr. Braun was defending a removal action before the NIH, the IRB contacted the Deafness Institute to inquire about Dr. Braun's employment status. On June 13, 2016, after Mr. Wheeles notified Dr. Braun of the decision to remove him, the Deafness Institute's Dr. Carter VanWaes contacted the IRB's Dr. Barbara Karp and asked her to call him. J.A. 94. That same day, Dr. Karp issued a memorandum stating: the IRB had been informed that Dr. Braun "will no longer be an NIH employee at the time of the planned IRB review" of Dr. Braun's remediation at an IRB meeting on June 15, 2016; "[t]he Institute plans to close the protocol"; and the matter was being removed from the IRB agenda. J.A. 95. It is undisputed that the NIH did not inform the IRB that Dr. Braun's removal would not become effective until June 25, 2016, ten days after the scheduled IRB meeting.

B

Dr. Braun appealed the Removal Decision to the Merit Systems Protection Board on July 19, 2016. The Board refiled his appeal about a year later. On February 28, 2019, an administrative judge issued an Initial Decision affirming the NIH's action, and the Initial Decision, under 5

C.F.R. § 1201.111(b)(5), became the final Board decision on April 4, 2019.  J.A. 1–26.

The Board first determined that there was ample evidence of such pervasive protocol violations as to undermine the ability to be sure of the study's validity, and it therefore sustained the NIH's charge of negligence in the performance of duties.  J.A. 1–9.  The Board next rejected Dr. Braun's contention that his due-process rights were violated by the Removal Decision's reliance, to support removal as the penalty, on his "'violation of recognized professional or agency standards of medical ethics or patient care,'" J.A. 10 (quoting J.A. 35), a premise Dr. Braun said did not appear in the Removal Proposal.  The Board concluded that the Removal Proposal, though using different words, gave adequate notice of that premise.  J.A. 10–11.  The Board then concluded that, contrary to Dr. Braun's contention, the conduct at issue came within the NIH Policy's § L(1) on "for cause" removal and hence was a proper basis for removal without de-tenuring.  J.A. 12–14.  The Board also determined that the Deafness Institute committed no "harmful error" when it informed the IRB of Dr. Braun's removal but did not say that the removal would not take effect for twelve days.  J.A. 14–16.

After addressing and rejecting Dr. Braun's charges of age discrimination and Equal Employment Opportunity retaliation, J.A. 16–23—charges that Dr. Braun has abandoned—the Board upheld the penalty of removal, concluding that Mr. Wheeles had properly considered the *Douglas* factors and had reached a decision within the bounds of reasonableness.  J.A. 23–26.  Despite Dr. Braun's long service without prior discipline, the Board concluded, the evidence permitted the deciding official to adopt the penalty of removal given the duration of the protocol violations and "the serious impact of [Dr. Braun's] pattern of negligent conduct, both for the potential safety of research participants, and for the ability of the agency to trust in the integrity of the scientific research itself."  J.A. 24.  The Board

also pointed to the statements of both Mr. Wheeles and the scientific director of the Deafness Institute that they had lost trust in Dr. Braun to carry out NIH research properly. J.A. 25. Finally, the Board rejected Dr. Braun's contention that the penalty decision reflected disparate treatment:

> Although it is undisputed that the agency has not previously removed a Senior or Principal Investigator, such as [Dr. Braun], based on negligence in the performance of duties, the record indicates that this circumstance is owing to the fact that other instances involving conduct of similar scope, that is, serious, continuing non-compliance with protocol requirements, resulted in the responsible scientists leaving the agency of their own accord, either for another job, or via retirement, during the course of pre-decisional negotiations of the type, indeed, that took place in this case as well, thereby obviating the need for any formal discipline. [J.A. 238–43] (Testimony of Dr. Michael Gottesman); [J.A. 258–64] (Testimony of Dr. Andrew Griffith). There is therefore no basis, on this record, for finding that the agency engaged in disparate treatment in bringing the present action.

J.A. 25–26.

Dr. Braun filed his appeal on May 29, 2019, within 60 days of April 4, 2019 (when the Initial Decision became the final Board decision), as permitted by 5 U.S.C. § 7703(b)(1)(A). We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## II

We will affirm the Board's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C.

§ 7703(c). We review legal determinations, "such as statutory interpretation, de novo." *Stephenson v. Office of Personnel Mgmt.*, 705 F.3d 1323, 1326 (Fed. Cir. 2013). An abuse of discretion is, for example, "an erroneous interpretation of law or unreasonable judgment in weighing relevant factors." *Robinson v. Dep't of Veterans Affairs*, 923 F.3d 1004, 1010 (Fed. Cir. 2019). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed. Cir. 1996)).

A

Dr. Braun's primary argument on appeal is that, because the conduct for which he was removed concerned his job performance, the NIH Policy prohibited the NIH from removing him without first taking away his tenure (which involves a process that the NIH did not follow). Dr. Braun's argument is a categorical one—that all job-performance-based removals are governed by § H(1) of the Policy, for which de-tenuring is required, and not by § L(1), for which de-tenuring is not required. Pet. Op. Br. 19–32. Like the Board, we reject Dr. Braun's contention. We conclude that it is clear that Section L(1)'s provision allowing removal "for cause"—on its own terms, and read in the context of the NIH Policy as a whole and in light of the closely related law of 5 U.S.C. chs. 43 and 75—neither requires de-tenuring nor excludes all job-performance-based removals. And once Dr. Braun's categorical argument is rejected, there is no basis for overturning the determination of the Board that the "for cause" provision was properly applied to this particular case.

1

As a matter of unambiguous meaning, de-tenuring is not required under the NIH Policy for a termination that comes within § L(1). Section L(1) of the NIH Policy states: "Appointments may be terminated before the expiration

date for cause, e.g., personal or scientific misconduct." J.A. 71. No provision requires de-tenuring for the application of that provision to a tenured scientist. And the absence of any such requirement is reinforced by the NIH Policy's express inclusion of de-tenuring requirements for two other bases of removal.

First, § L(1) itself, in the sentence immediately following the "for cause" sentence, goes on to authorize terminations "for administrative reasons" (in "certain rare and extraordinary circumstances"). *Id.* Two sentences later, the provision then states that "a tenured scientist may not be terminated for administrative reasons without going through the de-tenuring process." *Id.* The express imposition of that restriction for administrative-reason terminations in the paragraph that begins with the "for cause" sentence confirms that no such restriction applies to "for cause" removals.

Second, § H(1) of the NIH Policy provision addresses "Termination for Unacceptable Performance," J.A. 67— which is a termination tied to unsatisfactory results regarding identified "critical elements" after the employee has been given an opportunity to improve through a "performance improvement plan" as prescribed by § G, J.A. 66. *See also* §§ E, F, J.A. 64–66. A termination under § H(1) is one in which the "employee has demonstrated Unacceptable performance, based on the results of the opportunity given to improve performance and other relevant information." J.A. 67. As to that kind of termination, § H(1) states: "Tenured scientists must undergo the de-tenuring process before a performance-based action may be taken against them." J.A. 67. There is no counterpart to that requirement for "for cause" removals under § L(1).

2

We likewise conclude that § L(1)'s "for cause" provision unambiguously contradicts Dr. Braun's central contention, which is that the provision is inapplicable to any removal

that is based on conduct in performing the job. Such a reading is precluded by § L(1)'s express coverage of removal for "scientific misconduct," which the Board and the parties agree means "research misconduct" as set forth in 42 C.F.R. § 93.103.[1] J.A. 13; *see* NIH Intramural Research Program Policies & Procedures for Research Misconduct Proceedings (Aug. 3, 2010), J.A. 126. Research misconduct refers to "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." 42 C.F.R. § 93.103. That conduct, defined as particular severe forms of misconduct in research, will ordinarily be conduct in the performance of the job (of research). *See* HRPP Standard Operating Procedure/Policy Approval & Implementation ¶ 19.3.1 (revised March 8, 2016), J.A. 165 (defining an "investigator"—like Dr. Braun—as someone who is "conducting human subjects research (HSR) studies"). The language of § L(1) itself thus makes unambiguously clear that the same conduct can constitute deficient job performance and a form of misconduct within the "for cause" provision.

This conclusion is compellingly reinforced by the fact that just such an overlap has long been recognized under the statutory scheme that the NIH Policy's own structure clearly echoes, with its separate provisions for removals based on unacceptable results under performance plans keyed to critical elements of the job, *i.e.*, § H(1), J.A. 67, and for removals "for cause" (or for administrative reasons), *i.e.*, § L(1), J.A. 71. The parallel statutory provisions are found in title 5 of the United States Code. There, chapter 43 provides for federal agencies to develop performance-appraisal systems that, among other things, set performance

---

[1]    The Board found—and the NIH does not dispute—that Dr. Braun's conduct did not come within the narrow definition of "scientific misconduct." *See* J.A. 13; Response Br. 15.

standards, provide for performance-improvement plans based on critical elements of the job, and allow for "removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance," 5 U.S.C. § 4302(c). *See also* 5 U.S.C. § 4303(a) (authorizing removal "for unacceptable performance"); 5 U.S.C. § 4301(3) ("'unacceptable performance' means performance of an employee which fails to meet established performance standards in one or more critical elements of such employee's position"). At the same time, chapter 75 provides that an agency may remove an employee (or take certain other adverse actions) "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). The Supreme Court and this court have referred to the latter as a "for cause" provision. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 525, 530 (1988); *Dyer v. Dep't of Air Force*, 971 F.3d 1377, 1383–84 (Fed. Cir. 2020); *Kaplan v. Conyers*, 733 F.3d 1148, 1154 (Fed. Cir. 2013) (en banc); *Cheney v. Dep't of Health & Human Services*, 479 F.3d 1343, 1350 (Fed. Cir. 2007); *Lovshin v. Dept. of Navy*, 767 F.2d 826, 842–43 (Fed. Cir. 1985) (en banc). "Misconduct," we have long held, is "cause" even without "intent" on the employee's part, as long as it has a "nexus" to the efficiency of the service. *King v. Frazier*, 77 F.3d 1361, 1363–64 (Fed. Cir. 1996).

In *Lovshin*, this court elaborated on the relationship between chapter 43 and chapter 75 (which have not changed since *Lovshin* in ways material to the point at issue here). We explained that, despite the different standards articulated in chapter 43 (removal or demotion appropriate only for "unacceptable performance") and chapter 75 (adverse employment actions appropriate "only for such cause as will promote the efficiency of the service"), nothing in the statute precludes agencies from invoking chapter 75 to remove employees (or discipline them in other specified ways) for performance-related reasons. *Lovshin*, 767 F.2d at 843. Chapter 43, we held, cannot be

read to "implicitly eliminat[e] removal or demotion actions for performance reasons under Chapter 75." *Id.* (emphasis omitted).

That holding confirms our conclusion about the NIH Policy given the evident significant parallels in structure and language between the statute and the Policy. We therefore conclude that conduct that is performance-related, and might therefore be a basis for a removal under § H(1), can also be a basis of a "for cause" removal under § L(1).

3

Given the difference in procedural protections (particularly for tenured scientists) accompanying the two removal provisions, respect for the structure of the NIH Policy requires that the "for cause" standard of § L(1) not be so expansively applied as to cover routine performance deficiencies that could justify removal under § H(1) or otherwise to substantially supersede § H(1). We recognized the same imperative in *Lovshin* when describing the overlap between chapters 43 and 75 of Title 5. 767 F.2d at 842–43. "For cause" is not limited to "personal or scientific misconduct"—two forms of misconduct identified by the "e.g." language of § L(1) only as examples. Here, we have no occasion to attempt to define the outer boundaries of "for cause." The "for cause" provision encompasses misconduct of the form present in this case, which involved serious deficiencies in a researcher's job performance that supported an agency determination of loss of trust in the researcher's ability to carry out NIH research in accordance with fundamental NIH policies. The NIH's application of § L(1) in such circumstances accords with what we conclude is the fairest interpretation of the NIH Policy, and we therefore uphold it even without giving deference to the NIH's interpretation (which the NIH does not ask us to give).

Our decision in the statutory-counterpart context in *Fairall v. Veterans Admin.*, 844 F.2d 775 (Fed. Cir. 1987),

is importantly instructive. There, we upheld an agency's removal of a medical technologist for negligent performance, where the technologist made several errors recording blood test results in a lab notebook that was used primarily for internal lab purposes and sometimes consulted by treating physicians. *Id.* at 775. We explained that removal was proper under chapter 75—without an opportunity for the employee to improve her performance—given that the technologist's actions demonstrated "a penchant for negligence" that might "destroy the confidence of doctors and staff in the reliability of laboratory reports." *Id.* at 776. We concluded: "Where the record, as here, clearly indicates levels of negligence, whether gross or otherwise, it is not a case of performance deficiency *simpliciter* but rather is one also of misconduct, neglect of duty, or malfeasance." *Id.*

The facts here are analogous. The evidence permitted the conclusions that Dr. Braun, "over a long period of time," J.A. 34, failed to a "dramatic and disturbing" degree, J.A. 33, to comply with protocol requirements that exist "for the safety of the patients and the credibility of the research," J.A. 35. Moreover, given the "the extended breadth and seriousness" of the misconduct, the agency's executive officer Mr. Wheeles reasonably no longer had "confidence or trust in [Dr. Braun] to lead and manage a research study and staff, to publish with integrity, or to represent" the Deafness Institute or the NIH. J.A. 35. The scientific director testified to much the same loss of trust in Dr. Braun to carry out NIH research properly. *See* J.A. 25. These are graver and firmer conclusions, resting on an ample basis, than those for which the relatively brief performance-improvement-plan process is designed.

For those reasons, we conclude that Dr. Braun's removal came within the "for cause" provision of § L(1) of the NIH Policy.

B

Dr. Braun next argues that the NIH violated his due-process rights by listing negligent performance as the sole cause for removal in the Removal Proposal, but then, in the Removal Decision, relying on the Table of Penalties recommendation for disciplining "violation[s] of recognized professional or agency standards of medical ethics or patient care" Pet. Op. Br. 32–37. Like the Board, we reject this argument. We conclude that there has been no denial of due process.

Due process requires "notice and an opportunity to be heard." *Do v. Dep't of Housing & Urban Dev.*, 913 F.3d 1089, 1093 (Fed. Cir. 2019) (citing *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985)) (internal quotation marks omitted). The right to due process may be violated if, as to any basis for the ultimate removal decision, the notice of proposed removal did not "fully inform the employee of the grounds" so as to provide "an opportunity to make an informed response before the agency" on that basis. *Id.* at 1094. As to any basis ultimately relied on, a notice of removal must set forth the "nature of the charges 'in sufficient detail to allow the employee to make an informed reply.'" *Brook v. Corrado*, 999 F.2d 523, 526 (Fed. Cir. 1993) (quoting *Brewer v. U.S. Postal Service*, 647 F.2d 1093, 1097 (Ct. Cl. 1981)); *see also Do*, 913 F.3d at 1094 ("[I]n the civil service system, '[o]nly the charge and specifications set out in the Notice may be used to justify punishment.'" (quoting *O'Keefe v. U.S. Postal Serv.*, 318 F.3d 1310, 1315 (Fed. Cir. 2002)).

In this case, as to the violation of professional or agency standards, Dr. Braun had "enough information to permit preparation of an informed reply" on this point. *Brook*, 999 F.2d at 527. Dr. Braun was aware that his removal was based on his failure to comply with his protocol and that such noncompliance was serious and continuous. And, as the Board stated, "[t]he contention that [Dr. Braun's]

conduct violated agency and medical standards related to the safety and care of his research subjects is plainly included in the language" of the Removal Proposal. J.A. 11; *see* J.A. 28–29 (Dr. Braun's actions "demonstrated a pattern of repeated deviations from . . . accepted standards of medical practice," which "exposed subjects to unnecessary harm and impacted the integrity of the research"; invoking needed "consent procedures" and protection of "the rights, safety, and welfare of the research participants").

This court's *Do* decision involved materially different facts. There, the charge was that the employee (Do) violated an agency bar on hiring someone without a college degree, but when it turned out that no such rule applied at the relevant time, the deciding official removed Do for negligence in investigating whether the applicant was qualified for the position based on specified accounting credentials. *Do*, 913 F.3d at 1095. Do lacked notice that accounting credentials were at issue. *Id.* Here, in contrast, the Removal Proposal gave notice of the fact that the protocol violations involved departures from professional and agency standards relating to patient safety and medical ethics. *See id.* at 1097 n. 4 (listing cases where no due process violation was found where there were insignificant differences between the charge and the decision).

Dr. Braun also refers to the fact that the Removal Decision described his conduct as "misconduct," J.A. 35, whereas that word is absent from the Removal Proposal. Pet. Op. Br. 38–42. But this contention adds nothing to the contention about the professional or agency standards. Dr. Braun identifies no concrete way in which that word played any role beyond aptly labeling the serious, long-term departures from standards of which he had adequate notice. He identifies no argument or evidence that he would have presented had the word "misconduct" been included in the Removal Proposal. It is the substance of the charges, of which he had ample notice, that brought the conduct within the "for cause" provision of the NIH Policy's § L(1).

Thus, we affirm the Board's determination that there was no denial of due process.

C

Dr. Braun argues that the NIH—by misrepresenting the timing of his removal to the IRB—caused his remediation meeting with the IRB to be cancelled, and thus prevented him from making his case to continue his research. Like the Board, we conclude that the misstatement does not amount to harmful procedural error.

Harmful error from the misstatement would require (a) that the IRB would have gone ahead with the June 15 meeting on remediation even knowing that the removal of Dr. Braun, the head of the study, was to take effect ten days later and (b) that the IRB would have taken some action that would, in turn, have led the Deafness Institute's leadership to alter the removal decision. But the Board had evidence to reject this chain of reasoning. J.A. 14–16. The IRB's Dr. Karp, who handled Dr. Braun's review before the IRB, testified that the IRB and employment authorities proceed on their own courses, reflecting the deliberate independence of the IRB. *See* J.A. 196, 201, 203. And Dr. Michael Gottesman, the NIH's Director for Intramural Clinical Research, testified that he and the NIH viewed Dr. Braun's conduct as "serious enough to lead to termination," even if the IRB determined independently that remediation would be appropriate. J.A. 249. Moreover, the Board credited Dr. Karp's testimony that even if she had been aware that Dr. Braun would not depart until June 25, 2016, she would have sought guidance that likely would have confirmed her suspicion that the remediation meeting was no longer necessary. J.A. 16. Therefore, any misstatement by the NIH to the Board was harmless.

D

In his reply brief, Dr. Braun briefly challenges the penalty of removal on the ground that the NIH had not

removed any other researchers who committed serious and continuing protocol violations. Pet. Reply Br. 27–28. Dr. Braun made this argument to the Board, which rejected it. J.A. 25–26. But he has forfeited the argument in this court.

For reasons of fairness to appellees and of judicial efficiency, we generally refuse to consider an appellant's challenge to particular rulings in a decision under review unless the challenge was raised and properly developed in the appellant's opening brief—for which the reply brief and oral argument are not adequate substitutes. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319–20 (Fed. Cir. 2006); *see also Agile Defense, Inc. v. United States*, 959 F.3d 1379, 1383 n.* (Fed. Cir. 2020); *Impax Labs. Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1377 (Fed. Cir. 2018); *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 973 n.4 (Fed. Cir. 2006); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990). In his opening brief, Dr. Braun did not clearly set forth a disparate-treatment argument, let alone develop it, in the statement of issues, in the headings, or in the body of his argument. He did not even cite, much less discuss, in his opening brief the essential evidentiary basis for his reply brief's disparate-treatment argument—NIH's response to a discovery request asking about "determinations of serious and/or continuing non-compliance by any NIH IRB within the past 20 years." J.A. 97–100. Nor did Dr. Braun discuss the Board's specific finding that the evidence did not show disparate treatment. J.A. 25–26. Seeing no basis for an exception to the forfeiture rule in this case, we do not address this contention.

## III

The decision of the Merit Systems Protection Board is affirmed.

The parties shall bear their own costs.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**ALLEN R. BRAUN,**
*Petitioner*

**v.**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2019-1949

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-16-0743-I-2.

---

NEWMAN, *Circuit Judge*, dissenting.

The National Institutes of Health ("NIH"), a division of the Department of Health and Human Services ("HHS"), has a "tenure" system for its research scientists, governed by a complex of rules and procedures including, as relevant here, the "NIH Policy on Performance Management, Disciplinary Actions and Administrative Removals for Title 42 Employees" ("Policy Manual") and the Performance Management Appraisal Program Handbook ("PMAP Handbook"). PMAP Handbook, https://hr.nih.gov/sites/default/files/public/documents/ workforce/performance-management/pdf/hhspmaphandbook.pdf. This appeal concerns the failure and refusal of

the NIH to apply these required provisions to the removal of tenured scientist Dr. Allen Braun.

Dr. Braun came to NIH employ in 1984 and was awarded tenure in 2003. He is a medical doctor, board certified in neurology and nuclear medicine. His research at NIH produced over 125 publications, which have been cited in the scientific literature about 14,000 times, and he is described in the record as a world-recognized expert in the neural bases of language, sleep, and motor functions. At the time of his removal from employ at NIH, his position was Chief of the Voice, Speech, and Language Branch; and Senior Investigator, Division of Intramural Research, National Institute of Deafness and Other Communication Disorders ("NIDCD").

Based on an issue that arose concerning a multi-year study of the effect of trauma on speech and language, of which he was Principal Investigator, he was removed from NIH employ. In effecting this removal, he was not accorded the procedural safeguards for tenured scientists as set forth in the NIH Policy Manual and PMAP Handbook. This court now affirms the NIH removal procedure, and holds that these provisions need not be applied. Thus the court affirms elimination of critical aspects of the NIH tenure system.

I write in dissent, not only because of the errors and inequities that affect Dr. Braun, but because of the loss to NIH of the benefits of a viable system of tenure.

## DISCUSSION

The event that culminated in Dr. Braun's termination is summarized in the HHS brief as follows: in connection with his study of the effect of trauma on speech and language, Dr. Braun reported that he "had erroneously ordered a Magnetic Resonance Imaging (MRI) scan for the wrong patient under his protocol . . . [and that] he failed to review the medical record of the volunteer and that she did

not receive a history and physical ["H&P"] or pregnancy test prior to the MRI, nor was her eligibility for the study reported in the medical record." HHS Br. 5. An audit was conducted, and the auditor reported additional violations of patient protocols in this study. On review of the audit, the NIH Institutional Review Board ("IRB") suspended the study and asked Dr. Braun to submit a Remediation Plan, stating that "the study could continue if there is appropriate remediation." J.A. 84. Dr. Braun submitted the Remediation Plan, but before it was reviewed, the NIH terminated his employment, on the ground of "negligence in the performance of your duties." Proposal to Remove, May 13, 2016.

The termination did not include the procedures for tenured scientists as set forth in the NIH Policy Manual and the PMAP Handbook, such as the required period for performance improvement and the requirement for de-tenuring by the Central Tenure Committee. This court now sustains the NIH's disregard of its procedures for tenured scientists.

### The System of Tenure

The system of tenure derives from traditional practices in academic institutions, and is designed to impart quality, stability, and intellectual independence, and thereby to aid in recruitment and retention of scientists of the highest quality. The NIH states the Objective as follows:

The NIH tenure-track has been created to provide an unambiguous, uniform, and equitable mechanism for identifying and promoting outstanding scientists to the ranks of permanent intramural researchers. The goal of this system is to provide all necessary resources and encouragement to tenure-track scientists, thus giving them a fair opportunity to demonstrate their creativity and productivity as independent scientists.

Nat'l Insts. of Health, Off. of Intramural Res., *Tenure-Track Overview*, https://oir.nih.gov/sourcebook/tenure-nih-intramural-research-program/tenure-track-overview (last updated March 17, 2015). The NIH summarizes the purpose:

> [T]o ensure the highest attainable quality in the scientific staff engaged in intramural research and related medical care.

Nat. Insts. of Health, Off. of Intramural Res., *Tenure in the NIH Intramural Research Program*, https://oir.nih.gov/sourcebook/tenure-nih-intramural-research-program (March 17, 2015).

The system is elaborated in the Policy Manual; following are some Manual provisions relevant to this case:

> G.  Performance Problems:
>
> 1.  If at any time during the rating period an employee's performance is deemed to be Unacceptable in one or more critical elements, the employee will be given a documented performance improvement plan by his/her supervisor and an opportunity to demonstrate Acceptable performance. Employees must be under a performance plan for 120 days before performance can be determined to be Unacceptable, placed on a performance improvement plan, and possibly removed. The length of the documented opportunity to improve may vary depending on the employee's position, type of work, etc.
>
> 2. . . . . [T]he employee must be informed in writing that his/her performance is Unacceptable; the element(s) on which that rating is based and how the employee's performance was Unacceptable; what the employee must do to reach the Acceptable level of performance; the specific assistance that will be provided to help the employee; the time by which the performance must reach the Acceptable level;

and the action that may be initiated if the performance does not improve to the Acceptable level.

3. . . . When the employee is a tenured or tenure-track scientist, specific policies and procedures developed for these positions will apply. See the Office of Intramural Research Sourcebook . . . .

J.A. 66. The PMAP Handbook also describes actions, "at a minimum" for scientists who have been evaluated as "achieving unsatisfactory results":

If performance on any critical element is determined to be at the Achieved Unsatisfactory Results level at any time during the rating period, the supervisor will provide assistance to help the employee improve performance to the minimally acceptable level of Partially Achieved Expected Results, or better. The supervisor must, at a minimum, give written notice to the employee of his/her failure to demonstrate acceptable performance and provide the employee an opportunity to demonstrate acceptable performance under a PIP. The written notification must include:

- The specific elements on which the employee's performance is determined to be Achieved Unsatisfactory Results, including specific examples of how the employee's performance is unsatisfactory.
- The performance requirements that must be met.
- The specific assistance that will be provided and the meeting schedule for feedback, assistance, and coaching that will be established to help the employee improve performance.

> - The specific period of time the employee will be given to demonstrate acceptable performance.
> - Notification that actions may be initiated to reassign, reduce in grade, or remove the employee if performance does not improve to at least the Partially Achieved Expected Results level.
>
> The employee must be given a reasonable period of time in which to demonstrate a Partially Achieved Expected Results level of performance. The length of this reasonable opportunity period is not dictated by regulation nor Departmental guidance. The reasonable period of time to improve will be determined by management and may vary based on the requirements of the individual position and the amount of time and effort previously devoted to correcting the employee's performance deficiencies. . . . An employee who fails to improve under a PIP may be removed from federal service.
>
> Supervisors must promptly contact and consult with the LER [Labor Employment Relations] office for assistance in dealing with unacceptable performance and/or employee misconduct concerns.

PMAP Handbook, 19–20. None of these procedures were made available to Dr. Braun.

The Policy Manual flags special procedures that apply to tenured scientists:

> H.   Termination For Unacceptable Performance and Reductions in Pay (for employee[]s not serving a trial period):
>
> 1. Termination for Unacceptable Performance
>
> When an employee has demonstrated Unacceptable performance, based on the results of the

opportunity given to improve performance and other relevant information, the employee's supervisor or other designated official will prepare a recommendation for termination and a justification in support of that recommendation. . . . Tenured scientists must undergo the de-tenuring process before a performance-based action may be taken against them.  See section K.3. below.

J.A. 66–67.  This required de-tenuring process is a focus of this appeal, for it was denied to Dr. Braun.  Its conduct is detailed in the Policy Manual:

K.  The Tenure Process

* * *

3.  Removal of tenure is a rare event and only occurs after thorough review by the IC [Institute and Center] and the Central Tenure Committee (CTC) . . . First, a package that presents the case for de-tenuring should be submitted by the IC where the individual has tenure to the CTC.  In this package, the Scientific Director from the IC describes in a cover memo the reasons why the IC no longer has a vote of confidence in the achievements and potential of the investigator, as it had when tenure was conferred.  The investigator must receive a copy of this memorandum and has the opportunity to respond in writing. . . . At a meeting with the CTC, the Scientific Director should present the case for de-tenuring and answer questions from the CTC members. . . . The presentation should include evidence of an inability to function as a productive member of the scientific community (e.g., a serious, long-term decline in the person's productivity, qualifications, and fulfillment of expectations).  After answering all questions from the CTC, the Scientific Director should leave and the DDIR [Deputy Director for Intramural Research]

should ask for general CTC discussion. Then there should normally be a motion, followed by a secret written vote. The DDIR makes the final de-tenuring decision, taking into consideration the CTC's recommendation.

J.A. 69–70.

The de-tenuring procedure was refused, despite Dr. Braun's requests. And the NIH did not allow Dr. Braun the opportunity of performance improvement, as set forth in paragraph G.1, *supra.*

The Policy Manual also recognizes other possible grounds for termination:

L. Terminations for Cause or Administrative Reasons and Disciplinary Suspensions (for employee[]s not serving a trial period):

1. Terminations for Cause or Administrative Reasons

Appointments may be terminated before the expiration date for cause, e.g., personal or scientific misconduct. Under certain rare and extraordinary circumstances appointments may be terminated [ ] for administrative reasons. . . . However, a tenured scientist may not be terminated for administrative reasons without going through the de-tenuring process.

J.A. 71.

### The NIH Removal Action

As recited *ante*, during his study of the effects of trauma on speech and language, Dr. Braun reported to the NIDCD Clinical Director that he (Dr. Braun) had violated a protocol that he had established for this study. After an informal review, an independent third party audit was ordered, and the audit reported numerous protocol

violations.  After review of the audit, the IRB "determined that the study could continue if there is appropriate remediation," and asked Dr. Braun to submit a Remediation Plan.  IRB Decision, May 2, 2016.  Dr. Braun submitted a Remediation Plan on May 12, 2016, and the IRB scheduled a review meeting for June 15, 2016.

On May 13, 2016, the NIDCD Scientific Director issued a Proposal to Remove Dr. Braun on the ground of "negligence in the performance of your duties."  Dr. Braun responded, and also pointed to the required de-tenuring by the Central Tenure Committee, the required period for improvement, and the Institutional Review Board review of his Remediation Plan scheduled for June 15, 2016.  The record shows no reply to Dr. Braun.

The NIH issued its Decision on Proposed Removal on June 13, 2016, with immediate administrative leave and effective date of termination of June 25, 2016.  Dr. Braun was removed on the charge of negligence in performance, as the Notice to Remove stated repeatedly: at page 1, "The reason for this proposed removal is based on the following charge: Negligence in the performance of your duties."  At page 2, the caption is "Charge: Negligence in the performance of your duties."  At page 3, the conclusion is "Based on your negligence in the performance of your duties as outlined above, I am proposing your removal from your current position and from the Federal Service."

On June 13, 2016, the Chair of the Institutional Review Board wrote to the Board members: "The IRB Chair was informed today that Dr. Alan Braun, PI of this protocol, will no longer be an NIH employee at the time of the planned IRB review . . . for this protocol on Wednesday, June 15, 2016."  The scheduled review of the Remediation Plan was cancelled.

The NIH Decision of Removal stated that Dr. Braun "violat[ed] recognized professional or agency standards of medical ethics or patient care," and also mentions

"misconduct," although there had been no charge of such violations. The Decision stated that removal would "promote the efficiency of the Federal service" and that "[t]his misconduct could tarnish the reputation of the NIDCD and the NIH." J.A. 35.

The Decision was implemented without the obligatory performance improvement period and de-tenuring procedure. These procedural omissions, without more, constitute harmful error, for federal agencies are bound by their announced procedures. *See Doe v. Dep't of Justice*, 113 M.S.P.R. 128, 135 (2010) ("An agency is required to act in accordance with the procedures it adopts for itself, and the Board will enforce employee rights derived from such rules, regulations, policies, and collective bargaining agreements."); *Campbell v. U.S. Postal Serv.*, 75 M.S.P.R. 273, 279 (1997) (an agency is required to follow its own procedures).

Dr. Braun appealed to the Merit Systems Protection Board ("MSPB"), in accordance with *Lal v. Merit Systems Protection Board,* 821 F.3d 1376 (Fed. Cir. 2016).

**Appeal to the Merit Systems Protection Board**

The MSPB administrative judge sustained the agency's Decision of Removal, finding that "the appellant's failure to ensure that H&P examinations were performed for these 107 subjects, as prescribed under the research protocol he himself designed, constituted negligence in the performance of his duties, a circumstance sufficient to sustain the present charge, standing alone." *Braun v. Dep't of Health & Human Servs.*, 2019 WL 1047556 (M.S.P.B. Feb. 28, 2019) ("Board Op.") at 5–6.

At the MSPB, HHS argued that Dr. Braun had committed "misconduct" and violations of medical ethics and patient care, and that these infractions were not subject to the procedural protections for tenured scientists. However, the Proposal to Remove did not charge Dr. Braun with

these violations.  Precedent precludes removal on grounds not in the notice of proposed removal.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1378 (Fed. Cir. 1999) ("Public employees are, of course, entitled to whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution.").  However, in response to Dr. Braun's argument that he was not made aware of the charges to which he should respond, the administrative judge stated that "the essential nature or gravamen of this penalty consideration was communicated to the appellant with sufficient detail as to enable him to respond to it is supplied by the fact that he did, in fact, so respond."  Board Op. at 11.

Responding to Dr. Braun's argument that he had been deprived of the procedures required to be accorded to tenured scientists, the MSPB held that these procedures need not be followed, stating that "[Dr. Braun] has not established that it was harmful error for the agency to remove the appellant for cause, without first engaging in the detenuring process."  Board Op. at 14.

At the MSPB hearing, Dr. Braun also sought to defend his actions.  An array of experts, including seven MRI experts at NIH, testified that Dr. Braun's procedures did not violate any safety standard or ethical concept or present any medical risk.  There was no contrary evidence.  Indeed, HHS dropped its argument of possible patient risk when it was pointed out that MRI does not use radiation:

> Unlike X-ray, CT, and PET scans, MRIs do not use radiation and is considered a non-invasive procedure.

Braun Reply Br. 18 (quoting Harv. Univ., Dystonia & Speech Motor Control Laboratory, *Is MRI Invasive and Does It Use Radiation?*, https://simonyanlab.hms.harvard.edu/faq/mri-invasive-and-does-it-use-radiation).

Several experts on medical ethics and patient care testified concerning the charged misconduct, placing it in the context of the subject matter under investigation. They stated that in a study of speech and language, a full physical examination may not be necessary. An expert in research ethics and integrity testified: "I don't believe they [the research subjects] were put in . . . any additional risk as a result of the protocol violations. . . . [T]hey were primarily procedural protocol violations that needed to be remedied." Reply Br. 21 (quoting Test. Dr. Steneck (June 27, 2018) at 479:22–480:4).

A professor of medical ethics testified that the protocol violations that Dr. Braun reported to the IRB were not "violations of medical or ethical standards" *Id.* at 22 (Test. Dr. Moreno (June 27, 2018) at 518).

A director of a MRI research facility testified: "not only does Georgetown University not require an H&P at the time of an MRI, but he is unaware of any other institution that does, other than NIH" and that "Dr. Braun's failure to take an H&P prior to the MRI absolutely does not create an increased risk to the individual, and the American College of Radiology does not require one." *Id.* at 23–24 (citing Test. Dr. Van Meter (June 27, 2018) at 546–50).

A leading national MRI expert testified:

[G]iven the use of the standard ACR-based MRI pre-screening questionnaire and the MR-related standard safety features available and in routine use at the NIH, non-contrast MRI remained and continues to be a minimal risk procedure throughout these studies (as defined by the FDA). An additional    history    and    physical    performed

immediately prior to the scans would not be ex-
pected to modify or decrease this risk . . . there is
no recommendation to my knowledge by the Amer-
ican College of Radiology or any other organization
or society that publishes on or regulates safe MR
practices who does mandate a "routine history and
physical" as opposed to the MR-specific pre-screen-
ing described above . . . many, if not most, aca-
demic research centers in which non-contrast MRI
studies are performed in healthy volunteers do not
require that a history and physical examination be
performed as long as the ACR-based screening pro-
cess is applied and adhered to).

*Id.* at 24–25 (omissions in original) (Aff. Dr. Kanal (June 8, 2018) at 3).

There was no contrary evidence.

The Chair of the Institutional Review Board testified that "I'm not aware of anybody other than Dr. Braun who's been fired for non-compliance" with a protocol. J.A. 104. This aspect is relevant to application of the *Douglas* factors. *See Douglas v. Veterans Admin.,* 5 M.S.P.B. 313, 5 M.S.P.R. 280 (1981).

Nonetheless, the NIH argued, and the MSPB found, that Dr. Braun "violated medical ethics" and committed "personal or scientific misconduct." The MSPB ignored that the only Notice charge was "negligence in the performance of your duties." The issue of "misconduct" came to dominate the appeal to the Federal Circuit, as reflected in the majority opinion hereof.

### The Federal Circuit's Finding of Misconduct

My colleagues on this panel find that Dr. Braun's negligence in compliance with patient protocols is "personal or scientific misconduct." Maj. Op. at 10. Although there was no charge of misconduct, the court finds misconduct in the negligent performance of protocols, and on this ground the

court reasons that this removal is "for cause" and is not subject to tenure protection or the other NIH procedures related to performance.

"Misconduct" charges in science are extremely serious. "Research misconduct" is defined as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." 42 C.F.R. § 93.103. "Personal misconduct" is not amenable to simple classification, but its legal definition requires intentional wrongful behavior rather than negligence:

> Legal Definition of *misconduct*: intentional or wanton wrongful but usually not criminal behavior: as a: deliberate or wanton violation of standards of conduct by a government official, b: wrongful behavior (as adultery) by a spouse that leads to the dissolution of the marriage. . . .

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/misconduct.

The Policy Manual distinguishes negligent performance (Policy Manual § H Terminations for Unacceptable Performance) from personal or scientific misconduct (Policy Manual § L Terminations for Cause). The PMAP Handbook further distinguishes performance issues from misconduct issues:

> Unsatisfactory Performance vs. Misconduct

> It is important to note the distinction between performance at the Achieved Unsatisfactory Results level and employee misconduct. . . . [I]t is important to recognize the difference between the two and to take prompt and appropriate actions accordingly.

> Performance at the Achieved Unsatisfactory Results level is failure of the employee to perform the

> job at the required minimum retention level of Partially Achieved Expected Results.
>
> Misconduct is failure to follow a workplace rule, code, or behavior, whether written or unwritten. Examples of misconduct include tardiness, absenteeism, unprofessional or discourteous conduct, damaging or destroying government property, or falsification.

PMAP Handbook, 20. The PMAP Handbook makes evident that Level 1: Achieved Unsatisfactory Results is distinguished from a charge of misconduct. PMAP Manual, 13. Examples of "Achieved Unsatisfactory Results" include:

- Consistently fails to meet assigned deadlines.

- Work assignments often require major revisions.

- Fails to apply adequate technical knowledge to completion of work assignments.

- Frequently fails to adhere to required procedures, instructions, and/or formats in completing work assignments.

- Frequently fails to adapt to changes in priorities, procedures, or program direction.

*Id.* My colleagues err in promoting "misconduct" into a general category that includes negligence, whereby the court classifies all such performance actions as "cause" for removal, thereby avoiding the safeguards for tenured scientists and other announced NIH procedures.

It should be beyond debate that "[o]nly the charge and specifications set out in the Notice may be used to justify punishment because due process requires that an employee be given notice of the charges against him in sufficient detail to allow the employee to make an informed reply." *O'Keefe v. U.S. Postal Serv.*, 318 F.3d 1310, 1315 (Fed. Cir.

16                                                                    BRAUN v. HHS

2002).  Here, the Proposal to Remove made no mention of personal or scientific misconduct.

The threshold question before the court is whether Dr. Braun is entitled to the procedures for tenured scientists stated in the NIH Policy Manual and PMAP Handbook. The record provides no justification for the refusal to permit any opportunity to improve, the withholding of review by the Central Tenure Committee, and elimination of the remediation process at the Institutional Review Board.

The court now sustains the NIH's refusal to follow its announced procedures, the court holding that "NIH Policy as a whole . . . neither requires de-tenuring nor excludes all job-performance-based removals." Maj. Op. at 9. The court rules that "the same conduct can constitute deficient job performance and a form of misconduct within the 'for cause' provision," confirming removal of the distinction between negligent performance and misconduct. Maj. Op. at 11. And the court accepts that negligence is "misconduct" despite the contrary definition in the PMAP Handbook.

The court's removal of "negligence in performance" from the procedural safeguards in the NIH policy documents not only is an injustice to Dr. Braun, but diminishes the stature of HHS as an employer of scientists, for little, if anything, remains of the system of tenure.

I respectfully dissent.